1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MAGNANIMO DEAN LAW, APC**
LAUREN A. DEAN
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Tel: (818) 305-3450
Fax: (818) 305-3451
Email: Lauren@MagDeanLaw.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFF WITT AND JOSEPH BIRBIGALIA, Derivatively on Behalf of Nominal Defendant MULLEN AUTOMOTIVE, INC. F/K/A NET ELEMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DAVID MICHERY, IGNACIO NOVOA, MARY WINTER, KENT PUCKETT, MARK BETOR, WILLIAM MILTNER, JONATHAN NEW, AND OLEG FIRER, <br><br> Defendants, <br><br> -and-. <br><br> MULLEN AUTOMOTIVE, INC., F/K/A NET ELEMENT, INC., <br><br> Nominal Defendant. | CASE NO.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br><br><br><br><br><br><br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Jeff Witt and Jospeh Birbigalia ("Plaintiffs"), on behalf of Mullen Automotive, Inc. f/k/a Net Element, Inc. ("Mullen" or the "Company"), derivatively, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief and investigation of counsel as to all other matters. That investigation included, among other things, a thorough review and analysis of public documents, court filings, press releases and news articles concerning Mullen, and the other facts as set forth herein:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of Mullen, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties. Defendants' actions have caused, and will continue to cause, substantial financial harm and reputational damage to Mullen.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this Complaint involves a federal question, namely violations of Section 14(a) of the Exchange Act. Pursuant to 28 U.S.C. § 1367(a), the Court has supplemental jurisdiction over the state law claims asserted herein. This is not a collusive action to confer jurisdiction upon a court of the United States which it would not otherwise have.

3.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, including Nominal Defendant Mullen, a substantial portion of the transactions and wrongs complained of herein – including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to Mullen – occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

4.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## **PARTIES**

### **Plaintiffs**

5.     ***Plaintiff Jeff Witt*** ("Plaintiff Witt") is a current Mullen shareholder during the relevant period.  Plaintiff Witt will continue to hold Mullen shares throughout the pendency of this action.  Plaintiff Witt will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

6.     ***Plaintiff Jospeh Birbigalia*** ("Plaintiff Birbigalia") is a current Mullen shareholder during the relevant period.  Plaintiff Birbigalia will continue to hold Mullen shares throughout the pendency of this action.  Plaintiff Birbigalia will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### **Nominal Defendant**

7.     Nominal Defendant Mullen purports to be an electronic vehicle ("EV") manufacturer.   On November 5, 2021, Mullen Technologies, Inc. underwent a merger with and into Net Element, Inc., and the Company changed its name to Mullen Automotive, Inc. (the "Merger").  Nominal Defendant Mullen is incorporated in Delaware with its principal executive offices at 1405 Pioneer Street, Brea, California 92821. The Company's shares trade on the NASDAQ exchange under the ticker symbol "MULN."  Prior to the Merger, the Company's shares traded under the ticker symbol "NETE."

### **Director Defendants**

8.     ***Defendant David Michery*** ("Michery") has served as the Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board") of

the Company following the Merger.  Prior to the Merger, Defendant Michery served as the CEO of Mullen Technologies, Inc.

9. **Defendant Ignacio Novoa** ("Novoa") was appointed director on July 1, 2022.

10. **Defendant Mary Winter** ("Winter") has served as director of the Company since the closing of the merger with Net Element, Inc. on November 5, 2021, and has been a director of Mullen Technologies since 2018.  Winter has been an integral part of Mullen since inception.  She currently serves as the Secretary of the Company and Board of Directors.  Formerly, she was the Vice President of Operations for Mullen Technologies since 2014.

11. **Defendant Kent Puckett** ("Puckett") has served on the Board since 2018, serving as the Audit Committee Chair during that time.  Further, Defendant Puckett has served on Mullen Technologies' board since 2018, serving as the audit committee Chair during that time.  Previously, he served as the Chief Financial Officer of Mullen Technologies from 2012 to 2018. Defendant Puckett is the Chair of the Compensation Committee and a member of the Audit and Nominating and Governance committees.

12. **Defendant Mark Betor** ("Betor") has served as a director of the Company since the closing of the merger with Net Element, Inc. on November 5, 2021, and a director of Mullen Technologies since 2018, serving on the Compensation Committee of Mullen Technologies.  Defendant Betor is also a member of the Audit and Compensation committees, and Chair of the Nominating and Governance Committee.

13. **Defendant William Miltner** ("Miltner") has served as a director of the Company since the closing of the merger with Net Element, Inc. on November 5, 2021.  Defendant Miltner is a member of the Nominating and Governance Committee.

14.     ***Defendant Jonathan New*** ("New") has served as a director of the Company since the closing of the merger with Net Element, Inc. on November 5, 2021.  Defendant New is the Chair of the Audit Committee and a member of the Compensation Committee.

15.     Defendants Michery, Novoa, Winter, Puckett, Betor, Miltner and New are collectively referred to herein as "Director Defendants"

**Officer Defendant**

16.     ***Defendant Oleg Firer*** ("Firer") served as the CEO and Executive Director of the Company prior to the Merger.

17.     The Director Defendants and Defendant Firer are collectively referred to herein as "Defendants".

## THE AUDIT COMMITTEE

18.     The purpose of the Audit Committee is to assist the Board in fulfilling its oversight responsibility relating to the integrity of the Company's financial statements and financial reporting process and its system of internal accounting and financial controls, including the following functions:

- reviewing and approving the engagement of the independent registered public accounting firm to perform audit services and any permissible non-audit services for the Company;
- evaluating the performance of our independent registered public accounting firm and deciding whether to retain their services;
- monitoring the rotation of partners on the engagement team of our independent registered public accounting firm;
- reviewing our annual and quarterly financial statements and reports and discussing the statements and reports with our independent registered public accounting firm and management, including a review of disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations";
- considering and approving or disapproving all related party transactions for the Company;

- reviewing, with our independent registered public accounting firm and management, significant issues that may arise regarding accounting principles and financial statement presentation, as well as matters concerning the scope, adequacy and effectiveness of our financial controls;
- conducting an annual assessment of the performance of the Audit Committee and its members, and the adequacy of its charter; and
- establishing procedures for the receipt, retention and treatment of complaints received by us regarding financial controls, accounting or auditing matters.

## **THE AUDIT COMMITTEE CHARTER**

19. The Audit Committee Charter provides:

The responsibilities, duties and powers of the Audit Committee shall include:

**Review Procedures**

1. Reviewing the reports of management, internal audit and the independent auditors concerning the design, implementation and maintenance of the Company's internal controls and procedures for financial reporting, including meeting periodically with the Company's management, internal audit and the independent auditors to review their assessment of the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure.

2. Reviewing and providing oversight of the external audit by:

  a. reviewing the independent auditors' proposed audit scope and approach.

  b. discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies, disagreements with management and any other required communications described in applicable accounting standards.

c. reviewing with the independent auditors the Company's critical accounting policies and practices, alternative treatments of financial information within generally accepted accounting principles that have been discussed with management and the treatment recommended by the independent auditors, and other material written communications between the independent auditors and management.

d. reviewing reports submitted to the audit committee by the independent auditors in accordance with applicable SEC requirements.

3. Reviewing and approving the annual internal audit project plan and any proposed changes and reviewing periodic reports summarizing results of the internal audit projects.

4. Reviewing and discussing with management earnings releases (with particular attention to any use of "pro forma" or "adjusted" non-GAAP information), financial information and earnings guidance provided to the public, analysts and ratings agencies.

5. Reviewing and discussing with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC.

6. Recommending to the Board, if deemed appropriate, that the audited financial statements be included in the Company's Annual Report on Form 10-K, in accordance with the rules and regulations of the SEC.

7. Directing the Company's independent auditors to review before filing with the SEC the Company's interim financial statements included in Quarterly Reports on Form 10-Q, using professional standards and procedures for conducting such reviews.

## **SUBSTANTIVE ALLEGATIONS**

20.     On June 15, 2020, the Company issued a press release entitled "Net Element Enters into a Letter of Intent to Merge with Electric Vehicle Company Mullen Technologies" (the "06/15/20 Press Release"), which reported the merger between Net Element, Inc. and Mullen Technologies, Inc. and stated Mullen's ability and timeline to produce and sell automobiles:

> Net Element, Inc. (NASDAQ: NETE) ("Net Element" or the "Company"), a global technology and value-added solutions group that supports electronic payments acceptance in a multi-channel environment including point-of sale ("POS"), e-commerce and mobile devices, announced today that it has entered into a binding Letter of Intent to merge with privately-held Mullen Technologies, Inc. ("Mullen"), a Southern California-based electric vehicle company in a stock-for-stock reverse merger in which Mullen's stockholders will receive the majority of the outstanding stock in the post merger Company.
>
> Founded in 2014, ***Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021 through ICI (Independent Commercial Importers). Mullen currently has eight retail locations in California and one in Arizona***.
>
> * * *
>
> According to Mullen, Mullen also owns several synergistic businesses including: Mullen Auto Sales, a fast-growing series of automobile dealerships and CarHub, a new and unique digital platform that leverages Artificial Intelligence (AI) and offers a complete, easy-to-use solution for buying, selling and owning a car. … The company has 15 patents or patents pending related to its electric vehicles technology, including nine in the United States.
>
> ***The Dragonfly K50 has been featured at the New York International Auto Show on April 2019***.  The car also won the Governor's Choice Award at the 2019 Balboa Bay Club's Classic Auto Show.  The K50 has also been the subject of stories in the Wall Street Journal, ABC News, Autoweek, MotorTrend and Forbes, among many other publications. A video of the launch of the car at the New York Auto Show can be seen here. … ***Due to the COVID-19 pandemic, Mullen***

*pushed the targeted date for ICI release of the Dragonfly K50 for 2nd quarter of 2021*.

\* \* \*

According to Mullen, Mullen has created a different business model to enter the EV market with core tenants that include: fast-to-market, highly efficient, ready and proven initial vehicle leveraging an existing vehicle produced internationally and designed to U.S. market needs (development reduced from 4 years to 17 months), and complemented with a portfolio of competitively priced vehicles (three platforms) in the fast-growing Electric SUV segment.  According to Mullen, the first SUV Mullen expects to introduce will be the MX-05, a mid-size luxury SUV that will be featured as a battery electric vehicle.

[Image omitted.]

According to Mullen, *due to launch in Q3-Q4 of 2021, the MX-05 represents Mullen Automotive's entry into the full-electric and range extender, luxury SUV market*. The MX-05 is expected to fit the Mid-Size SUV segment.  *Mullen projects for pre-launch to have several hundred units produced in 2021 and kickoff into full production in 2022.*

\* \* \*

**About Mullen Technologies**:

Mullen Technologies is a Southern California based *licensed electric vehicle manufacturer with international distribution* that operates in various verticals of businesses focusing in the automotive industry; Mullen Automotive, Mullen Energy, Mullen Auto Sales, Mullen Funding Corp., and Carhub. Each of these divisions provide Mullen with diversity of different products and services within the automotive industry. For more information, please visit: www.mullenusa.com. [Emphasis added].

21.     In the 06/15/20 Press Release, Defendant Michery stated the following regarding the Company's ability and timeline to produce and sell automobiles:

"We believe the timing of this merger is ideal for Mullen Technologies," said Mr. Michery. "*It comes on the preparation of our launch of the Dragonfly K50, which will be available in Q2 of 2021* and through our retail network in California and Arizona and *the development of a new EV model, the MX-05 Sport Utility Vehicle, that we expect the start of production next year* . . . ." [Emphasis added].

22.     The 06/15/20 Press Release also stated the following regarding the Company's dealings with other companies:

> Founded in 2014, *Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021 through ICI* (Independent Commercial Importers). Mullen currently has eight retail locations in California and one in Arizona.
>
> * * *
>
> *Mullen is launching this car in conjunction with a cooperation agreement with Qiantu Motor*, a wholly-owned subsidiary of CH-Auto, a leading automotive design and manufacturing company in China. [Emphasis added].

23.     The 06/15/20 Press Release also stated the following regarding Mullen's battery technology and capabilities:

> In addition, becoming public at this time should allow us to accelerate the development of our unique battery technology which is non-flammable, puncture proof, capable of maintaining full capabilities after 500,000cycles, and is synthetic, requiring no mining of natural resources. [Emphasis added].

24.     The 06/15/20 Press Release also quoted Defendant Firer stating the following, in pertinent part, regarding Net Element's due diligence into Mullen:

> "We feel, *after considering an array of strategic alternatives, that the agreement with Mullen provides our shareholders with the most compelling opportunity*," said Oleg Firer, Net Element's Chairman and Chief Executive Officer. "*We conducted an extensive search of companies that have disruptive technologies, and believe that Mullen represents the best path forward*. We expect that the merger with

Mullen will create a new path forward that should reward our long-time shareholders." [Emphasis added].

25.     On December 15, 2020, the Company issued a press release captioned *NETE: Q3 2020 Revenues Improve Despite Continued Shutdowns in NY and California*, which reported the following regarding its due diligence into Mullen Technologies and Mullen Technologies' ability and timeline to produce and sell automobiles:

**Update on Mullen Technologies Transaction**

***Net Element is still diligently working on completing the transaction with Mullen Technologies.  Mullen is still in process of an audit and the S-4 document is being drafted***.  We expect to see it filed by year-end.

Mullen Technologies itself has been progressing on its plans to sell and produce electric vehicles in the US.  It started on construction of its pilot manufacturing facility in October and started also taking pre-orders on its $55,000 MX-05 fully electric SUV then.  It is repurposing its high voltage battery R&D center as a pilot facility for its line of SUVs.  The construction is planned for completion by April 2021 and we have no information that that timeline has changed.  ***There the MX-05 SUVs will be assembled to be delivered to customers by the second quarter of 2022.***  The facility is designed to assemble as many as a thousand SUVs annually with other models possible later.  The company said it plans to hire 100 people to assemble the SUV, the battery, conduct R&D, and provide warehousing.  Once completed the plant will build prototypes that will we used to get government approval and certification, a process that should take 16 months. After that, the company could begin deliveries to consumers.  ***Customers can also pre-order the imported Dragonfly K50 super sports car from Mullen*** [sic]

**About Mullen Technologies**:

Mullen Technologies is a Southern California-based ***licensed vehicle manufacturer*** that operates in various verticals of the businesses, focusing in the automotive industry: Mullen Automotive, Mullen Energy, Mullen Auto Sales, Mullen Funding Corp. and CarHub. Each

of these divisions provide Mullen with diversity of different products and services within the automotive industry. For more information, please visit: www.MullenUSA.com.  [Emphasis added].

26.     On November 15, 2021, the Company issued a press release captioned *Mullen Automotive Announces It Now Owns Tunica, Mississippi, EV Assembly Plant Free and Clear*, which stated the following regarding the Company's production ability and timeline:

> Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an emerging electric vehicle ("EV") manufacturer, is pleased to announce today that the company closed purchase of the Tunica, Mississippi, Advanced Manufacturing and Engineering Center (AMEC) without any debt and will begin ramp-up of hiring for the initial set of skilled trades and support staff.  AMEC is in Robinsonville, Mississippi, which is located in Tunica County and is approximately 40 miles south of Memphis, Tennessee.

> **Mullen's previously announced plans on Nov. 5 to build out another 1.2 million square feet of manufacturing space to support class 1 and class 2 EV cargo vans and the Mullen FIVE EV Crossover at AMEC.** The facility currently occupies 124,000 square feet of manufacturing space. The total available land on the property is over 100 acres. On the expanded site, Mullen plans to build a body shop, a fully automated paint shop, and a general assembly shop.

> Mullen's commitment to the facility is strong and growing with hiring ramp-up now beginning for initial workers to support the initial preproduction build of class 1 and class 2 EV Cargo Vans.

> "This is a milestone for Mullen," stated David Michery, CEO and chairman of Mullen Automotive. "We now own this facility free and clear, with no associated debt or financial obligations on the property. AMEC is a tremendous asset for the company, and we are proud to begin hiring and build-out of the Tunica facility."  [Emphasis added].

27.     On February 28, 2022, the Company issued a press release entitled *EV Manufacturer Mullen Announces Progress on Solid-State Polymer Battery Pack*

*Development* (the "02/28/22 Press Release"), which stated the following regarding its battery technology and capabilities and also its deals with business partners:

> Data collected from solid-state cell testing shows impressive results, including a range of 600-plus miles on a full charge and over 300 miles of range delivered in 18 minutes with DC fast charging.  Solid-state polymer batteries are slated for the second generation of the Mullen FIVE EV Crossover.

> […] Mullen Automotive, Inc. (NASDAQ: MULN) ("Mullen" or the "Company"), an emerging electric vehicle ("EV") manufacturer, announces an update on Mullen's next-generation solid-state polymer battery technology, which is a significant advancement over today's current lithium-ion batteries.

> ***Mullen's testing of solid-state polymer cells reveals the potential for a 150-kilowatt-hour battery pack that delivers over 600-plus miles of range and highlights an 18-minute DC fast charge which can yield over 300 miles of range***. Mullen is working towards utilizing solid-state polymer battery packs in its second generation Mullen FIVE EV Crossovers, with in vehicle prototype testing set for 2025. Mullen's first-generation FIVE EV Crossover, due in late 2024, is planned to launch with traditional lithiumion cell chemistry.

> ***Mullen is also conducting extensive research and development into other advanced battery technologies, including lithium-sulfur and lithium ironphosphate***.  Mullen's ultimate goal is to deliver EV batteries that will surpass today's existing lithium-Ion technology and offer a host of benefits such as increased efficiency, energy density, and range while also lowering the cost, weight, thermal and environmental risks.

> \* \* \*

> ***Mullen has recently announced a string of key partnerships with hofer powertrain, Comau, ARRK, Dürr, and DSA Systems for EV powertrain, engineering, manufacturing, vehicle production systems, and over-the-air (OTA) and vehicle system diagnostics***, respectively. The Company expects these strategic developments to play a crucial

role in bringing the FIVE to market with the latest technology and in the shortest amount of time.  [Emphasis added].

28.    In the 02/28/22 Press Release, Defendant Michery stated the following regarding the Company's battery technology and capabilities:

"We've conducted successful testing and will begin pack level development next," said David Michery, CEO and chairman of Mullen Automotive.  "***The test data collected shows an impressive outcome and future for solid-state batteries***. To sum up, we tested our 300 Ah (ampere-hour) cell which yielded 343 Ah at 4.3 volts, and ***the results surpassed all expectations.  We can say with almost certainty that this technology, once implemented on the Mullen FIVE, will deliver over 600 miles of range on a full charge.*** The future is bright for Mullen Automotive."  [Emphasis added].

29.    On March 17, 2022, the Company tweeted the following, touting its battery technology and capabilities:

# MullenAutomotive featured on Yahoo Finance Live!  […] ***$MULN was identified as a standout that is doing well among falling #EV stocks due to its solid-state battery technology and strong domestic presence***.  # ElectricCars #MullenFIVE #GreenTechnology

[Image omitted.]

[Emphasis added].

30.    The statements referenced in ¶¶ 20-29 above, made by or attributed to Defendants, were false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them.  Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company overstated its ability and timeline regarding production; (2) the Company overstated its deals with business partners, including Qiantu; (3) the Company overstated its battery technology and capabilities; (4) the Company overstated its ability to sell its branded products; (5) Net Element did not

conduct proper due diligence into Mullen Technologies; (6) the Dragonfly K50 was not (solely) delayed due to the COVID-19 pandemic; and (7) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### THE TRUTH EMERGES

31.    On April 6, 2022, market analyst Hindenburg Research released a report regarding the Company captioned *Mullen Automotive: Yet Another Fast Talking EV Hustle*, which detailed several alleged issues with the Company (the "Hindenburg Report").

32.    The Hindenburg Report stated the following regarding the Company's production ability and timeline:

- Mullen is an aspiring EV manufacturer that came public in late 2021 via reverse merger. It has yet to produce a sellable vehicle. […]
- Recently, Mullen shocked the market by claiming it would begin manufacturing 2 models of electric vans within months for an unnamed "major, major Fortune 500 customer". The news sent its stock up ~35% intraday.
- The 2 electric cargo vans that Mullen claims it will be manufacturing are actually Chinese EVs rebranded with a Mullen logo.  Import records show the company recently imported 2 vehicles from China, one of each model.

\* \* \*

***Mullen's Vehicle Offering #3: The Mullen FIVE, a Compact SUV The Company Aspires to Develop, Manufacture and Deliver by The End of 2024***

The Mullen FIVE is pitched on the company's website as a "premium compact sport utility electric vehicle" that was "born out of [Mullen's] love" for California. The company says it is "designed, engineered, and manufactured entirely in the USA".

[Image omitted.]

In 2021, Mullen reported only $3 million in R&D expenditures, which consisted "primarily" of Mullen FIVE EV show car development by "employees and consultants".

We estimate that the company would likely need billions in capital to launch the FIVE, given that Mullen proposes to essentially build the vehicle and retool/build a manufacturing facility from the ground up in order to mass-produce the vehicle.

The company has barely made any progress toward this massive goal, acknowledging in its recent annual report that it is still negotiating with various manufacturing integration companies to assist in all aspects of design and development of a facility.

Nonetheless, Mullen said it hopes to complete its manufacturing facility by Q1 of 2024, and have a sellable Mullen FIVE 9 months later, by the 4th quarter of 2024.

\* \* \*

**Location #4 - Tunica, MS (November 2021)**

**The Plant Was Previously Tooled to Build a Pizza Delivery Car, But Its Prior Owners Never Managed to Sell a Single Vehicle**

 **Mullen Originally Said The 134,700 sq/ft Facility Would Serve as A Pilot Plant. But With Its Memphis Plans Abandoned, Mullen Claims It Intends to Expand the Plant by an Additional 1.2 Million sq/ft, With No Details On Bow This Will Even Be Physically Possible**

\* \* \*

According to the Mississippi State Auditor, Greentech's electric car plant closed "before it ever produced a car quoted the state auditor as saying." An article quoted the state auditor as saying:

"On the day when they cranked up those energy-efficient electric cars and blue smoke bellowed out, you knew that this was a sham from the very beginning."

* * *

Other media reports, citing federal documents, said Greentech may have produced a total of 25 vehicles at the Tunica plant, but not a single one was reportedly sold.

**Mullen Claims Its Former Pizza Car Manufacturing Facility in Mississippi Is Stocked with State-of-the-Art Equipment and Machinery**

**But Pictures and Video of the Facility Show It Has Limited Equipment**

***The Company's Website Features One Photo of Advanced Manufacturing Equipment. We Found That It Was a Stock Photo***

Mullen Automotive calls the Tunica, Mississippi facility Its Advanced Manufacturing Engineering center (AMEC). The company states that "AMEC is fully tooled with state-of-the-art equipment and machinery."

Given Greentech's limited history of production, it is not clear how much assembly line equipment was ever installed nor how much was in place when the Tunica plant was shuttered.

However, a 2017 review by the Mississippi State Auditor mentioned assembly equipment and car parts offered as loan collateral by Greentech amounting to only $3.4 million. It is not clear if that was the total value of assembly equipment at the factory when Greentech went bankrupt.

Mullen's website has a brief video that shows the interior of the factory. It looks to have storage space, tables and chairs for employees, and several lifting cranes. It does not appear from the video that there are any assembly lines, or robotic manufacturing machines.

[Image omitted.]

However, Mullen's website does feature one picture that shows advanced manufacturing robots. An online search shows that it's a stock photo, which appears to have been purchased from Adobe stock images.



*Source: Mullen's website (http://www.mullenusa.com/manufacturing)*



(*Source: Adobe Stock Photos (https://stock.adobe.com/494146009)*)

33.     The Hindenburg Report stated the following regarding the Company's dealings with Qiantu:

- In 2019, the Mullen Dragon Fly was revealed as a supercar built by Chinese manufacturer Qiantu Motors and was meant to be

rebranded and sold by Mullen starting in 2020. ***Following the reveal, Mullen immediately defaulted on its payment obligations to Qiantu, leading to termination of the agreement in October 2019.***

- Mullen continued to market the vehicle as its own.  In legal documents, Qiantu alleges this is "an inexcusable misuse of Qiantu's own intellectual property".  Despite the termination of the agreement, Mullen to this day still says the Dragon Fly is "Coming Soon" on its website and is soliciting $1,000 reservations for the vehicle.

- For its other proposed vehicle, an electric SUV, Mullen previously announced it received an order for 10,000 vehicles, representing $500 million in potential revenue. We called the South Florida contractor firm that placed the order. It currently has only around 11 vehicles, none of which are electric. [Emphasis added].

34.    The *Hindenburg Report* stated the following regarding the Company's battery technology and capabilities:

- The company's stock has spiked ~316% in the past couple of months driven by retail investor euphoria over bold claims of ground-breaking technology, near term production of its EV vans, and a major as-yet unnamed Fortune 500 customer.

- Despite only spending ~$3 million in R&D in 2021, Mullen claims its solid-state battery technology is on track for commercialization in 18 to 24 months, putting it head of every major technology and automaker in the industry who have collectively invested billions on solving the problem.

- Mullen recently press released an update on its battery testing, sending its stock soaring 145% in a day.  In reality, the "news" appears to be a rehash of testing the company had already announced in 2020.

- Mullen apparently misrepresented the test results, according to the CEO of the company that performed the tests.  Its CEO told

us of Mullen's press release:  "We never would have said that. We never did say it and certainly wouldn't have said it based on the results of testing that battery.

\* \* \*

With only $360 (numbers not in thousands) in unrestricted cash as of December 31st, 2021, nearly $19 million in near-term debt, $48.4 million in current liabilities and consistent operating losses, the company seemed to be teetering on insolvency right out of the gate.

Then, on February 28th, 2022 the company made a surprising announcement. Despite spending only $3 million in R&D during its entire fiscal 2021, Mullen claimed it had made progress and "significant advancement"' on development of solid-state batteries, a widely regarded "holy grail" of the EV battery industry that has long-eluded tech and automaker giants such as Panasonic and Volkswagen. The stock rallied ~145% on the day.

\* \* \*

**Part I: Mullen's Bold Claims of Being on the Cusp of Revolutionizing the Solid-State Battery Market**

**Mullen's Claims About Its Solid-State Battery Development Would Put It Ahead of Every Major Automaker, Which Have Collectively Invested Billions into The Technology**

The auto industry is collectively investing billions into developing solid state battery technology. Given Mullen's tiny 2021 R&D of $3 million, which it acknowledged mainly went toward building show cars, we found its claims to have ground-breaking solid-state battery tech to be exceedingly implausible.

In a January 28th, 2022, interview, Michery claimed Mullen was on track to commercialize solid-state polymer batteries in the next 18 to 24 months, putting it well ahead of every other major automaker working on this critical industry issue.

By comparison, solid-state technology developer Quantumscape has a cumulative $1.2 billion in order to develop solid-state battery

technology, with $300 million coming from Volkswagen. The company said it aims to commercialize production in 2024-2025.

Other major auto companies have later targets. Toyota has thousands of patents in the solid-state battery field with its partner Panasonic, and aims for deployment in 2025. Mercedes aim to introduce their solid-state technology by 2027 and 2026 respectively, while Nissan and BMW aim to produce it by 2028 and 2030, respectively. Other major automakers like GM, Ford and Hyundai have all announced major investments or partnerships in solid-state technology without clear timelines for production.

* * *

**Mullen's Battery Claims Were Based on Technology Licensed from A Newly Formed Chinese Battery Technology Company Called Linghang Boao**

*Mullen Made Only One $390,000 Payment Under Its Licensing Deal. It Then Announced the Importance of the Relationship Around Its Go-Public Merger, Then Promptly Then Terminated the Deal*

Lingbang Boao's Websites No Longer Work

In November 2019, Mullen entered into a three-year Strategic Cooperation Agreement ("SCA") with Linghang Boao Group Ltd to co-develop a solid state battery management system with a 480-720-mile driving range.

The Company's total financial commitment under the agreement was $2,196,000. On December 3, 2019, the Company paid the first installment of $390,000. It would be the only payment made in the agreement.

Linghang Boao was registered in China in November 2018, just one year before its agreement with Mullen, according to Chinese corporate records.  It shares a cell phone number with at least 99 other companies and listed its address inside a high-rise building (not a factory).

Its U.S. website just 9 months prior to its agreement with Mullen, no longer works. Nor does its Chinese website. An online slide deck about

the company, uploaded 2 years ago, claims it "has been continuously breaking through in the field of power and energy storage batteries".'

Nonetheless, the agreement with Linghang Boao seemed to serve as the foundation for Mullen's bold battery claims. During its announced gopublic merger on June 15 2020 Mullen said:

". . . becoming public at this time should allow us to accelerate the development of our unique battery technology which is non-flammable, puncture proof, capable of maintaining full capabilities after 500,000 cycles, and is synthetic, requiring no mining of natural resources."

Just months later, around September 2020, Mullen terminated the relationship, claiming that COVID was a force majeure event.

Our Overall Take: Mullen's Battery Tech Claims Are Smoke And Mirrors

**We think Mullen has severely and repeatedly misled investors on its claimed battery technology.** Its latest iteration of its battery story is an agreement with Nextech Batteries, a small Nevada-based R&D firm with about 17 employees on LinkedIn. We spoke with Nextech's CEO, Bill Burger, and found him to be straightforward about the stage of his technology. He explained that while they are optimistic, they are presently in the prototype and R&D phase, and aiming to secure financing in order to build out a manufacturing facility, continue testing, and move toward higher volume.

**We suspect that Mullen is once again attempting to borrow credibility from others in order to make grandiose claims to investors, pitching aggressive short-term timelines that bear little resemblance to reality**. [Emphasis added].

35.    The Hindenburg Report stated the following regarding the Company's ability to sell its branded products:

- Mullen has other major production hurdles.  The company has no EPA certificates for its vans (nor any vehicle), a requirement to sell vehicles in the U.S. that often takes 12-18 months.  It has only a handful of job openings for its plant, and hasn't begun

significant hiring, according to the President of the Tunica County Chamber of Commerce. […]

- Mullen's plant in Tunica Mississippi was previously tooled to build a pizza delivery car, but prior owners never managed to sell a single vehicle.

- Mullen originally said the 124,700 sq/ft facility would serve as a pilot plant, but after abandoning several other plant projects, Mullen now claims it intends to expand the plant 1 Ox, or an additional 1.2 million sq/ft, with no details on how this will even be physically possible.

- **Mullen claims its former pizza car manufacturing facility in Mississippi is stocked with state-of-the-art equipment and machinery, but photos and video of the facility show it has limited equipment.**

- **Mullen's website features one photo of advanced manufacturing equipment. we found that it was a stock photo which appears to have been purchased from Adobe stock images**.

\* \* \*

**Despite having a limited staff of just 44 full-time employees as of 2021 fiscal year-end, Mullen announced that it would imminently begin manufacturing electric vans for an unnamed Fortune 500 customer**. The prospect of near-term revenue and a major, credible customer resulted in an immediate 35% intraday stock spike.

\* \* \*

**The Reality On The Ground Seems to Starkly Differ From Mullen's Claims of Imminent Production**

**The Company Has No EPA Certificates for Its Vans (Nor Any Vehicle), A Requirement to Sell Vehicles in The U.S. That Often Takes 12-18 Months**

**Furthermore, Mullen Hasn't Begun Significant Hiring for Its Plant, According to The President of The Tunica County Chamber of Commerce**

Even if Mullen *does* choose to surreptitiously import and/or assemble and rebrand Chinese vehicles, additional hurdles prevent its claimed near-term U.S. customer deliveries.

*According to the EPA website neither Mullen, Tenglong nor DFSK have certificates required to sell vehicles in the U.S. We also checked with the EPA press office who wrote us they had received no certificate applications for any Mullen vehicles.*

*The EPA makes it clear these certificates are compulsory*:

"A Certificate of Conformity is the document that EPA issues to a vehicle manufacturer to certify that a vehicle class conforms to EPA requirements. Every class of motor vehicle introduced into commerce in the United States mug have a Certificate of Conformity. Certificates are valid for only one model year of production."

We consulted an Independent Commercial Importer (ICI), one of 6 entities that have obtained official EPA credentials to legally import vehicles into the United States, about how long it could take Mullen to obtain certificates of conformity for Chinese passenger vehicles and light vans. A representative for the ICI told us:

"Cost and time to be determined - after inspection average 12 to 18 months." According to experts we consulted, in order to qualify, vehicles must go through crash testing and inspections. Vehicles sold in Europe or China must often be reworked to suit the safety requirements of the U.S. market, such as adding airbags, changing belts, and modifying wheels and other components. …

All vehicles sold in the U.S. must also comply with Federal Motor Vehicle Safety Standards (FMVSS) testing required by the NHTSA. Mullen has yet to disclose whether its vans have begun this process, let alone satisfied these criteria.

\* \* \*

*Given that Mullen has no apparent EPA certificates, no apparent FMVSS testing and no apparent adequately staffed factory, we estimate that the company is years away from ever delivering a vehicle should it actually take genuine steps to do so*.

\* \* \*

**Mullen's Vehicle Offering #2: The Mullen "DragonFly"**

**2019: The Mullen DragonFly Was Revealed as A Supercar Built by Chinese Manufacturer Qiantu Motors, Meant to Be Rebranded and Sold Through Mullen Starting in 2020**

Another of Mullen's key prospective product offerings is the DragonFly, a luxury sedan supercar manufactured by Qiantu out of China.

The vehicle, known as the Qiantu K50, was introduced in China in 2015. In December 2018, Mullen and Qiantu announced a cooperation agreement to "homologate and assemble cars in the us for sales in North America." Mullen put its logo on the car and revealed it as the rebranded "DragonFly" to the U.S. market in April 2019 at the New York International Auto Show. …

***Following the Reveal, Mullen Immediately Defaulted on its Payment Obligations to Qiantu, Leading to Termination of the Agreement in November 2019***

**Yet Mullen Continued to Market the Vehicle as Its Own. In Legal Documents Qiantu Alleges This is "An Inexcusable Misuse of Qiantu's Own Intellectual Property"**

***Behind the scenes, the partnership quickly went south. Subsequent litigation records reveal that Mullen immediately defaulted on its obligations, missing its first payment to Qiantu to cover pre-launch costs.***

With an outstanding balance owed by Mullen to Qiantu of almost $23 million, Qiantu terminated the agreement in November 2019. It also expressed surprise in its earlier Notice of Termination to Mullen that "Mullen could so badly miss the mark immediately out of the gate."

[Image omitted.]

Rather than acknowledge the end of the deal. Mullen continued to market the partnership as if it were ongoing, Qiantu alleged in legal documents. It even continued soliciting reservations for the vehicle, calling it the "Mullen K50" on social media posts.

* * *

**Despite the Termination of The Agreement with Qiantu, Mullen Continued to Market the Offering, Including During Its Go-Public Period**

***To This Day, It Still Says the DragonFly Is "Coming Soon" On Its Website and Is Soliciting $1,000 Reservations for the Vehicle***

Despite the termination of the agreement and the ongoing dispute, the Dragon Fly has been continuously marketed by Mullen as an ongoing offering.

On June 15, 2020, 7 months after the Qiantu agreement had been terminated and had devolved into litigation, the press release announcing Mullen's gopublic merger said:

"Mullen expects to launch the Dragonfly K50, a luxury sports car, in the first half of 2021" Chairman/CEO Michery was then quoted as saying:

"[The merger] comes on the preparation of our launch of the Dragonfly K50, which will be available in Q2 of 2021."

***To this day, the DragonFly is featured on Mullen's website, which is currently soliciting reservations with a $1,000 deposit***.

[Image omitted.]

Other parts of the Mullen website claim the DragonFly Is "coming soon".

[Image omitted.]

In its most recent annual report, Mullen claimed to be pursuing the purchase of intellectual property rights relating to the K-50. Should it succeed, it would presumably need to figure out a way to actually manufacture the vehicle, a process we expect would not be "coming soon".

***Chinese Media Reports That Qiantu Ran into Financial Trouble Around 2020 And Halted Production of the K50***

A closer look at the timing and subsequent collapse of the Qiantu-Mullen deal reveals a Chinese company that lacked finances to build the vehicle negotiating with an American company that didn't have the cash to buy it. [Emphasis added].

36.     On this news, Mullen's stock price fell $0.27 per share, or 10%, to close at $2.38 per share on April 7, 2022.

## DUTIES OF DEFENDANTS

37.     By reason of their positions as officers, directors, and/or fiduciaries of Mullen and because of their ability to control the business and corporate affairs of Mullen, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Mullen in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Mullen and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

38.     Each director and officer of the Company owes to Mullen and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future

business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

39.    Defendants, because of their positions of control and authority as directors and/or officers of Mullen, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Mullen, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Mullen.

40.    To discharge their duties, the officers and directors of Mullen were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Mullen were required to, among other things:

a)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

       d)     remain informed as to how Mullen conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

       e)     ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

41.    Each Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Mullen, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

42.    Each director and officer of the Company owed to Mullen the fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty not to advance their own personal, financial, or economic interests over, and at the expense of, the Company's public shareholders, or to allow other Mullen directors, officers, and/or employees to do so. Each director and officer of the Company also owed Mullen and its shareholder-owners the duty to maintain the Company's confidential information and prevent others from misappropriating and/or trading while in possession of the Company's proprietary, confidential information.

43.     Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra.* Defendants' subjected the Company to the costs of defending and the potential liability from a class action lawsuit for violations of the federal securities laws.  As a result, Mullen has expended, and will continue to expend, significant sums of money.

44.     Defendants' actions have irreparably damaged Mullen's corporate image and goodwill.

**DEMAND FUTILITY ALLEGATIONS**
**FOR THE BOARD OF MULLEN**

45.     Plaintiffs will adequately and fairly represent the interests of Mullen and its shareholders in enforcing and prosecuting its rights.

46.     Plaintiffs bring this action derivatively in the right and for the benefit of Mullen to redress injuries suffered and to be suffered by Mullen because of the breaches of fiduciary duty by Defendants.

47.     Because of the facts set forth herein, Plaintiffs have not made a demand on the Board of Mullen to institute this action against Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

48.     The Mullen Board is currently comprised of Michery, Novoa, Winter, Puckett, Betor, Miltner and New.  Thus, Plaintiffs are required to show that a majority of Defendants, *i.e.*, *four* (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

49.     Defendants face a substantial likelihood of liability in this action because they caused Mullen to issue false and misleading statements concerning the information described herein.  Because of their advisory, executive, managerial, and directorial positions with Mullen, Defendants had knowledge of material non-public

information regarding the Company and was directly involved in the operations of the Company at the highest levels.

50.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for Mullen shareholders.

51.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiffs have not made (and is excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

52.     Any suit by the Board to remedy these wrongs would likely expose the Company to further violations of the securities laws that would result in civil actions being filed; thus, the Board members are hopelessly conflicted in making any supposedly independent determination about whether to sue themselves.

53.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

54.     Defendants authorized and/or permitted the Company to make false statements that disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## **DEFENDANTS ARE NOT INDEPENDENT**

**Defendant Michery**

55.     Defendant Michery has served as the Chairman of the Board, President and Chief Executive Officer of the Company since the closing of the merger with Net Element, Inc. on November 5, 2021, and held those same positions at Mullen Technologies, Inc. since its inception in 2018.  His automotive experience began with the acquisition of Mullen Motor Company in 2012.

56.     Defendant Michery is not disinterested or independent, and therefore, is incapable of considering demand because Michery (as CEO) is an employee of the Company who derived substantially all of his income from his employment with the Company, making him not independent.   As such, Michery cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

57.     Defendant Michery earned the following as an officer of the Company in 2021 and 2020:

| Year | Salary | Bonus | Common Shares | Preferred Shares | Total |
|------|--------|-------|---------------|------------------|-------|
| 2021 | $409,485 | $ ----- | $1,972,603 | $ ----- | $2,514,993 |
| 2020 | $263,014 | $25,000 | $2,500,000 | $30,451,000 | $33,239,014 |

58.     Further, the following table provides information with respect to equity awards held by Defendant Michery as of fiscal year ended September 30, 2021:

| | Number of shares or units of stock that have not vested (#) | Market value of shares of units of stock that have not vested ($) |
|---|---|---|
| | 750,000 | $1,875,000 |

59.     This lack of independence and financial benefits received by Defendant Michery renders him incapable of impartially considering a demand to commence and vigorously prosecute this action.

60.     Defendant Michery is also a defendant in the securities class actions entitled *Gru v. Mullen Automotive, Inc., et al.*, Case 8:22-cv-00976 (C.D. Cal.) and *Schaub v. Mullen Automotive, Inc., et al.*, Case 2:22-cv-03026 (C.D. Cal.) (the "Securities Class Actions").

61.     Defendant Michery is not independent from Defendants Betor, New and Puckett, because they comprise the Mullen Compensation Committee and are responsible for evaluating and determining the compensation of the CEO (Defendant Michery).  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Michery could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.  *See, e.g.*, *Rales v. Blasband*, 634 A.2d 927, 937 (Del. 1993); *Steiner v. Meyerson*, 1995 WL 441999, at *10 (Del. Ch. July 19, 1995); *In re The Student Loan Corp. Derivative Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002); *In re Veeco Instruments, Inc. Sec. Litig.*, 434 F. Supp. 2d 267, 275 (S.D.N.Y. 2006) (applying Delaware law) (fact of director's deriving his principal income from employment by the corporation makes it improbable that he could perform his fiduciary duties without bring influenced by his overriding personal interest) (citing *In re General Motors (Hughes) S'holder Litig.*, 2005 WL 1089021, at *8 (Del. Ch. May 4, 2005)).

62.     Further, Defendant Michery has provided loans to the Company.  The outstanding balances for these loans as of March 31, 2021 and September 30, 2020 are $86,404 and $172,791, respectively.

**Defendant Novoa**

63.     On January 12, 2022, the Company entered into a one-year Consulting Agreement with Defendant Novoa.  Defendant Novoa was also issued

an aggregate of 255,500 shares of Common Stock pursuant to the terms of the Consulting Agreement.

64.    Defendant Novoa is not disinterested or independent and is incapable of considering demand because Novoa is a paid consultant of the Company and derives substantial income from his employment with the Company, making him not independent.

65.    Defendant Novoa is not independent from Defendants Betor, New and Puckett, because they comprise the Mullen Compensation Committee and are responsible for evaluating and determining the compensation of Defendant Novoa.

**Defendant Winter**

66.    On October 26, 2021, the Company and Defendant Winter entered into a Consulting Agreement whereby the Company has agreed to pay Winter $60,000 for the period from October 1, 2021 to September 30, 2022 for her services as corporate secretary and director.

67.    Defendant Winter is not disinterested or independent and is incapable of considering demand because Winter is a paid consultant of the Company and derives substantial income from her employment with the Company, making her not independent.

68.    Defendant Winter currently serves as the Secretary of the Company and Board of Directors.  Formerly, Defendant Winter was the Vice President of Operations for Mullen Technologies since 2014.

69.    Defendant Winter is not independent from Defendants Betor, New and Puckett, because they comprise the Mullen Compensation Committee and are responsible for evaluating and determining the compensation of Defendant Winter.

**Defendant Alban**

70.    Defendant Alban has served as the Chief Operating Officer ("COO") and a director of the Company since the closing of the merger with Net Element, Inc. on November 5, 2021, and held the same position at Mullen Technologies

since June 2021.  Prior to that position, he served as Chief Financial Officer at Mullen Technologies from April 2018 until November 2021.  Defendant Alban also served as an internal consultant for the Company since January 2018.

71.    Defendant Alban earned the following at the Company in 2021 and 2020:

| Year | Salary | Bonus | Common Shares | Preferred Shares | Total |
|------|--------|-------|---------------|------------------|-------|
| 2021 | $283,835 | $ ----- | $25,000 | $ ----- | $308,835 |
| 2020 | $240,000 | $10,000 | $87, 500 | $ ----- | $337,500 |

72.    Further, the following table provides information with respect to equity awards held by Defendant Alban as of fiscal year ended September 30, 2021:

| | Number of shares or units of stock that have not vested (#) | Market value of shares of units of stock that have not vested ($) |
|---|---|---|
| | 225,000 | $562,500 |

73.    In addition, effective April 15, 2021, the Compensation Committee approved a new employment contract for Alban for a term of one year.  He will receive an annual salary of $350,000 per year and a share-based compensation of 300,000 shares of Common Stock each year.  Alban received a one-time signing bonus of 100,000 restricted shares of Common Stock.

74.    Defendant Alban is not disinterested or independent and is incapable of considering demand because Alban is a paid consultant of the Company and derives substantial income from his employment with the Company, making him not independent.

75.    Also, Defendant Alban is not independent from Defendants Betor, New and Puckett, because they comprise the Mullen Compensation Committee and are responsible for evaluating and determining his compensation.

**Defendants Michery, Winter, Alban, Puckett and Betor**

76. Defendant Michery has served as the Chairman of the Board, President and Chief Executive Officer of the Company since the closing of the merger with Net Element, Inc. on November 5, 2021, and held those same positions at *Mullen Technologies, Inc.* since its inception in 2018.

77. Defendant Winter has served as director of the Company since the closing of the merger with Net Element, Inc. on November 5, 2021, and has been a director of *Mullen Technologies* since 2018. Defendant Winter has been an integral part of Mullen since inception.

78. Defendant Alban has served as the Chief Operating Officer and a director of the Company since the closing of the merger with Net Element, Inc. on November 5, 2021, and held the same position at *Mullen Technologies* since June 2021. Prior to that position, he served as Chief Financial Officer at *Mullen Technologies* from April 2018 until November 2021. Alban also served as an internal consultant for the Company since January 2018.

79. Defendant Puckett has served on *Mullen Technologies*' Board since 2018, serving as the audit committee Chair during that time. Previously, he served as the Chief Financial Officer of *Mullen Technologies* from 2012 to 2018.

80. Defendant Betor has served as a director of the Company since the closing of the merger with Net Element, Inc. on November 5, 2021, and a director of *Mullen Technologies* since 2018.

81. As a result of the prior business relationships at Mullen Technologies among Defendants Michery, Winter, Alban, Puckett, and Betor, they are unable to evaluate a demand with independence, and therefore, demand is excused.

82. Professional or personal friendships raises a reasonable doubt whether these directors can appropriately consider demand. Likewise, substantial past or current relationships of a business nature may, if material to the director, give rise to a pleading-stage inference of beholdenness.

**FIRST CAUSE OF ACTION**

**(Against Defendants For Breach Of Fiduciary Duty)**

83.     Plaintiffs incorporate by reference and re-allege each allegation contained above, as though fully set forth herein.

84.     Defendants owed and owe the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty and due care.

85.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

86.     Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

87.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant and actual damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

88.     Plaintiffs, on behalf of the Company, have no adequate remedy at law.

**SECOND CAUSE OF ACTION**

**(Against Defendants For Unjust Enrichment)**

89.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

90.     By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of the Company in the form of salaries, bonuses, and other forms of compensation.

91.     Plaintiffs, as shareholders and representatives of the Company, seek restitution from Defendants, and each of them, and seeks an order of this Court

disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## THIRD CAUSE OF ACTION

### (Against Defendants For Abuse Of Control)

92.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

93.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

94.     As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

95.     As a result of the misconduct alleged herein, Defendants are liable to the Company.  Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### (Against Defendants For Waste Of Corporate Assets)

96.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

97.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets by failing to disclose (i) the Company had a material weakness in its internal control over financial reporting; (ii) the Company's disclosure controls and procedures were not effective; and (iii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

98.     As a result of the waste of corporate assets, Defendants are each liable to the Company.

99.     Plaintiff, on behalf of the Company, have no adequate remedy at law.

### FIFTH CAUSE OF ACTION

### (Against Defendant Firer For

### Violations Of Section 14 Of The Exchange Act)

100.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

101.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.  Specifically, the Company's Proxy filed on October 13, 2020 violated § 14(a) and Rule 14a-9 because it sought shareholder ratification of previously issued equity awards while omitted to disclose material information regarding whether the awards were warranted.

102.    In the exercise of reasonable care, Defendants should have known that the statements contained in the proxy statement were materially false and misleading.

103.    The misrepresentations and omissions in the Proxy were material to Company stockholders in voting on the proxy statement.  The Proxy solicited and obtained stockholder vote for ratification of the approval of the issuance of 119,361 restricted shares of common stock to Defendant Firer.

104.    The Company was damaged as a result of Defendants' material misrepresentations and omissions in the Proxy.

105.    No adequate remedy at law exists for Plaintiffs by and on behalf of the Company

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment as follows:

A.     Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, waste of corporate assets and violations of Section 14(a) of the Exchange Act;

B.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

C.     Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED: August 1, 2022

**MAGNANIMO DEAN LAW, APC**

By:  */s/ Lauren A. Dean*
LAUREN A. DEAN
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Tel: (818) 305-3450
Fax: (818) 305-3451
Email: Lauren@MagDeanLaw.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Tel: (212) 983-1300
Fax: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiffs***

**VERIFICATION**

I, JEFF WITT, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Mullen Automotive, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Mullen Automotive, Inc. common stock at all relevant times.

Dated: July ___21___, 2022

_____

JEFF WITT

## **VERIFICATION**

I, JOSEPH BIRBIGALIA, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Mullen Automotive, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Mullen Automotive, Inc. common stock at all relevant times.

Dated: July __28__, 2022

_____
JOSEPH BIRBIGALIA

1