Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MULLEN AUTOMOTIVE, INC. DERIVATIVE LITIGATION | Lead Case No. 2:22-cv-05336-DMG-(AGRx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT AND FEE AND EXPENSE AMOUNT** |
| This Document Relates to:<br><br>ALL ACTIONS | Date: January 24, 2025<br>Time: 10:00 a.m.<br>Courtroom: 8C, 8th Floor<br>Judge: Honorable Dolly M. Gee |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................ 1

II.   THE SETTLEMENT'S TERMS ................................................................... 3

III.  THE SETTLEMENT SHOULD BE FINALLY APPROVED ............................ 6

  A.   Legal Standards For Final Approval .................................................... 6

  B.   The Settlement Provides Substantial Benefits to Mullen and its Shareholders .. 7

  C.   The Risks, Costs and Delay of Continued Litigation ......................... 8

  D.   The Settlement is the Result of Informed, Arm's Length Negotiations ........... 12

IV.  THE NEGOTIATED FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE ..................................................................................... 14

  A.   The Fee and Expense Amount Was Agreed to at Arm's-Length ...................... 14

  B.   The Applicable Factors Support Approval of the Agreed-to Fee and Expense Amount .............................................................................. 15

     1.   The Agreed-to Fee and Expense Amount is Fair and Reasonable in Light of the Benefits Achieved and Attorneys' Fees in Similar Cases ........... 16

     2.   The Risks of Litigation .............................................................. 18

     3.   The Skill Required and the Quality of Work ............................... 18

     4.   The Contingent Nature of the Fee and Burdens on Plaintiffs' Counsel . 19

     5.   A Lodestar "Cross-Check" Further Supports the Agreed-to Fee and Expense Amount ..................................................................... 20

V.   THE SERVICE AWARDS SHOULD BE APRPOVED ................................... 21

VI.  CONCLUSION ......................................................................................... 22

i

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Cases**

4

5
*Allred  v. Walker*,
    2021 WL 5847405 (S.D.N.Y. Dec. 9, 2021) ..............................................15

6

7
*Amans v. Tesla, Inc.,*
    2024 WL 1024735 (N.D. Cal. Mar. 8, 2024) ..............................................12

8

9
*Arnett v. Bank of Am., N.A.*,
    2014 WL 4672458 (D. Or. Sept. 18, 2014) .................................................22

10

11
*Basaraba v. Greenberg,*
    2014 WL 12591677 (C.D. Cal. Nov. 10, 2014) .............................................8

12

13
*Bateman Eichler, Hill Richards, Inc. v. Berner*,
    472 U.S. 299 (1985)....................................................................................18

14

15
*Berkey Photo, Inc. v. Eastman Kodak Co.*,
    603 F.2d 263 (2d Cir. 1979) .......................................................................10

16

17
*Buccallato v. AT&T Operations, Inc.,*
    2011 WL 3348055 (N.D. Cal. June 30, 2011)............................................20

18

19
*Charlebois v. Angels Baseball LP*,
    993 F. Supp. 2d 1109 (C.D. Cal. 2012) ......................................................21

20

21
*Cohn v. Nelson,*
    375 F. Supp. 2d 844 (E.D. Mo. 2005) ...................................................3, 18

22

23
*Del Monte Foods Co. S'holder Litig.,*
    2011 WL 2535256 (Del. Ch. June 27, 2011)..............................................19

24

25
*Destefano v. Zynga, Inc.*,
    2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ..............................................20

26

27

28

ii

*Farrar v. Hobby*,
   506 U.S. 103 (1992)..................................................................................16

*Fleming v. Impax Labys Inc.*,
   2022 WL 2789496 (N.D. Cal. July 15, 2022) ........................................21

*Grant v. Bethlehem Steel Corp.*,
   823 F.2d 20 (2d Cir. 1987) .....................................................................10

*Griffin v. Consol. Commc'ns*,
   2023 WL 3853643 (E.D. Cal. June 6, 2023) ..........................................14

*Hensley v. Eckerhart*,
   461 U.S. 424 (1983)................................................................................14

*Hope Med. Enters., Inc. v. Fagrgon Compounding Serv., LLC*,
   2022 WL 826903 (C.D. Cal. Mar. 14, 2022)..........................................21

*In re AOL Time Warner S'holder Derivative Litig.*,
   2006 WL 2572114 (S.D.N.Y. Sept. 6, 2006) ......................................3, 11

*In re Apple Computer, Inc. Derivative Litig.*,
   2008 WL 4820784 (N.D. Cal. Nov. 5, 2008) ......................................7, 14

*In re Cendant Corp., Derivative Action Litig.*,
   232 F. Supp. 2d 327 (D.N.J. 2002) .........................................................22

*In re Ceradyne, Inc.*,
   2009 WL 10671494 (C.D. Cal. June 9, 2009) ..........................................7

*In re Emerging Commc'ns, Inc. S'holders Litig.*,
   2004 WL 1305745 (Del. Ch. May 3, 2004)..............................................10

*In re Heritage Bond Litig.*,
   2005 WL 1594403 (C.D. Cal. June 10, 2005) .........................................19

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
   2015 WL 1153864 (N.D. Cal. Mar. 13, 2015) ..........................................7

iii

*In re Lloyd's Am. Tr. Fund Litig.*,
  2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002)......................................................10

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) .............................................................................7

*In re MRV Commc'ns, Inc. Derivative Litig.*,
  2013 WL 2897874 (C.D. Cal. June 6, 2013).................................................*passim*

*In re NVIDIA Corp. Derivative Litig.*,
  2008 WL 5382544 (N.D. Cal. Dec. 22, 2008)........................................................8

*In re NVIDIA Corp. Derivative Litig.*,
  2009 U.S. Dist. LEXIS 24973 (N.D. Cal. Mar. 18, 2009) .....................................16

*In re Omnivision Techs., Inc.*,
  559 F. Supp. 2d 1036 (N.D. Cal. 2008) .................................................................9

*In re OSI Sys., Inc. Derivative Litig.*,
  2017 WL 5642304 (C.D. Cal. May 2, 2017)................................................7, 10, 19

*In re Pac. Enters. Sec. Litig.*,
  47 F.3d 373 (9th Cir. 1995) ...........................................................................8, 12

*In re Pinterest Derivative Litig.*,
  2022 WL 484961 (N.D. Cal. Feb. 16, 2022) ..........................................................6

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
  163 F.R.D. 200 (S.D.N.Y. 1995) ........................................................................11

*In re Rambus Inc. Derivative Litig.*,
  2009 WL 166689 (N.D. Cal. Jan. 20, 2009)...........................................................8

*In re Schering-Plough Corp. S'holders Derivative Litig.*,
  2008 WL 185809 (D.N.J. Jan. 14, 2008)...............................................................16

*In re Walt Disney Co. Derivative Litig.*,
  907 A.2d 693 (Del. Ch. 2005) .............................................................................9

iv

*Kabasele v. Ulta Salon, Cosms. & Fragrance, Inc.*,
   2024 WL 477221 (E.D. Cal. Feb. 7, 2024) ............................................................ 11

*Klein v. City of Laguna Beach*,
   810 F.3d 693 (9th Cir. 2016) ............................................................................ 16

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998) ............................................................................ 6

*Lloyd v. Gupta*,
   2016 WL 3951652 (N.D. Cal. July 22, 2016) ................................................ 6

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) ............................................................................ 16

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970) ................................................................................... 7, 16

*Mohammed v. Ells*,
   2014 WL 4212687 (D. Colo. Aug. 26, 2014) ................................................ 3

*Moore v. Verb Tech. Co., Inc.*,
   2021 WL 11732976 (C.D. Cal. Mar. 1, 2021) ................................... 7, 12, 18

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ................................................................. *passim*

*Purple Mountain Tr. v. Wells Fargo & Co.*,
   2023 WL 11872699 (N.D. Cal. Sept. 26, 2023) ............................................ 21

*Roberti v. OSI Sys, Inc.*,
   2015 WL 8329916 (C.D. Cal. Dec. 8, 2015) ............................................ 12, 20

*Sauby v. City of Fargo*,
   2009 WL 2168942 (D.N.D. July 16, 2009) ................................................ 22

*Stanger v. China Elec. Motor, Inc.*,
   812 F.3d 734 (9th Cir. 2016) ............................................................................ 21

v

*Unite Nat'l Ret. Fund v. Watts*,
   2005 WL 2877899 (D.N.J. Oct. 28, 2005) ................................................................7

*van der Gracht de Rommerswael v. Auerbach*,
   2019 WL 7753447 (C.D. Cal. Jan. 7, 2019)..................................................9, 12, 17

*Vizcaino v. Microsoft Corp.*,
   290 F.3d 1043 (9th Cir. 2002) ................................................................................20

*Young v. Polo Retail, LLC*,
   2007 WL 951821 (N.D. Cal. Mar. 8, 2007) ............................................................20

*Zapata Corp. v. Maldonado*,
   430 A.2d 779 (Del. 1981) ........................................................................................14

**Statutes**

8 *Del. C.* §102(b)(7)........................................................................................................10

**Rules**

Fed. R. Civ. P. 23.1 ...........................................................................................6, 9, 18

Plaintiffs Jeff Witt, Joseph Birbigalia, and Hany Morsy ("Plaintiffs") in the above-captioned ("Action") respectfully submit this Memorandum of Points and Authorities in Support of Final Approval of Settlement and Fee and Expense Amount.

## I.    <u>INTRODUCTION</u>

The Settlement[1] provides substantial benefits to Mullen Automotive, Inc. ("Mullen" or the "Company") and its shareholders with the adoption, enactment, and maintenance of comprehensive reforms to improve Mullen's corporate governance processes and procedures (the "Corporate Governance Enhancements"). This guaranteed recovery, in the face of uncertainty and risks of continued litigation, provides Mullen with finality and improvements strengthening its operations.

The Settlement is the product of hard fought, arm's-length negotiations by experienced and well-informed counsel, with the assistance of Robert A. Meyer, Esq. of JAMS, a respected mediator with an extensive background mediating stockholder derivative actions. Meyer Declaration (Exhibit A to Declaration of Erica L. Stone ("Stone Decl."), submitted herewith).

Mullen's Board of Directors (the "Board"), in exercising its good faith business judgment, determined that "the Settlement and each of its terms are fair, reasonable, and in the best interest of Mullen and its current shareholders." Stip. ¶V.2.2. Further, Mullen "acknowledges that the Corporate Governance Enhancements … confer substantial benefits on Mullen and its current shareholders" (*id*., §IV.2.3) and that Plaintiffs' efforts of "the filing, pendency, and settlement of the Consolidated Derivative Action caused the adoption and implementation of the Corporate Governance Enhancements," (*Id*., ¶V.2.2), and "that it is desirable and beneficial that

---

[1] Unless otherwise noted, all capitalized terms herein shall have the same meaning as set forth in the Stipulation and Agreement of Settlement (the "Stipulation" or "Stip.") (ECF No. 31).

the Consolidated Derivative Action, and all of the Settling Parties' disputes related thereto, be fully and finally settled in the manner and upon the terms and conditions set forth in this Stipulation." *Id.*, §III.

The Corporate Governance Enhancements, attached as Exhibit 1 to the Stipulation (ECF No. 31, Page ID357-Page ID362), are tailored to address the wrongdoing the Action asserts, greatly reducing the chance of Mullen suffering future legal exposure from similar alleged misconduct.[2] The Corporate Governance Enhancements include, *inter alia*: the establishment of a new Risk Committee (Stip., ¶V.3.2); the creation of a Disclosure Committee (*Id.*, ¶V.3.3); improvements to the Nominating and Corporate Governance Committee Charter (*Id.*, ¶V.3.5; Ex. 4); improvements to the Compensation Committee Charter (*Id.*, ¶V.3.6; Ex. 5); improved director education (*Id.*, ¶V.3.8); improved Board composition and practices (*Id.*, ¶3.9; Ex. 6); and the formalization of a Whistleblower Policy (*Id.*, ¶V.3.10; Ex. 7). As set forth in more detail below, the Corporate Governance Enhancements provide a substantial benefit to the Company and its shareholders. *See* §III(B) *infra*. When weighed against the significant risks, the Settlement's guarantee of substantial benefits in the form of the strong governance processes, policies, and procedures embodied in the Corporate Governance Enhancements are fair, reasonable and adequate.

Plaintiffs also seek Court-approval of the agreed-upon award of attorneys' fees and reimbursement of expenses of $500,000 (the "Fee and Expense Amount") in recognition of the substantial, valuable benefits the Corporate Governance Enhancement provide Mullen. Stip., ¶V.6.1. Mullen does not object to this request. *Id.*, ¶V.6.2. The Fee and Expense Amount is the result of a mediator's proposal after the Corporate Governance Enhancements were documented. Stone Decl., ¶21; Meyer Decl., ¶11. Plaintiffs also seek Service Awards in total of $6,000, that will be funded

---

[2] Numbered exhibits refer to those attached to the Stipulation.

from the Fee and Expense Award, if the Court grants these requests. Stone Decl., ¶46.

Plaintiffs respectfully submit that final approval of the Settlement is warranted. The Settlement provides guaranteed, substantial benefits to Mullen and its shareholders that balances the risks of further litigation against the adoption of the Corporate Governance Enhancements. All aspects of the Settlement we reached after negotiations overseen by Mr. Meyer. Thus, the Settlement is fair, reasonable, and adequate.

## II.    **THE SETTLEMENT'S TERMS**[3]

If finally approved, the Settlement guarantees the adoption, implementation, and maintenance of the comprehensive Corporate Governance Enhancements. These reforms are designed to: address Plaintiffs' allegations in the Action; reduce the likelihood that the same or similar alleged wrongdoing will recur; and overall strengthen Mullen's corporate governance, oversight, and internal controls. Stip., ¶¶V.2-3; Ex. 1. Mullen has agreed to maintain the Corporate Governance Enhancements for at least four (4) years after the Judgment becomes Final. Stip., Ex. 1. Plaintiffs believe that this is sufficient time for the Corporate Governance Enhancements to become embedded in Mullen's policies, practices, and corporate culture, with the hope Mullen will continue to maintain these reforms. Courts routinely approve the same or shorter commitment terms. *Cohn v. Nelson*, 375 F. Supp. 2d 844, 850 (E.D. Mo. 2005) (at least three years will "provide meaningful ways of avoiding the problems [the company] experienced in the recent past"); *In re AOL Time Warner S'holder Derivative Litig.*, 2006 WL 2572114, at *2 (S.D.N.Y. Sept. 6, 2006) ("at least four years from the effective date of the Settlement."); *Mohammed v. Ells*, 2014 WL 4212687, at *2 (D. Colo. Aug. 26, 2014) (three years). The Corporate Governance

---

[3] The factual and procedural background of the Action is set forth in the accompanying Stone Decl., which is an integral part of this submission. For the sake of brevity, Plaintiffs respectfully refer the Court thereto for a detailed description of: (i) the factual background and procedural history (*id.*, ¶¶7-16); (ii) the settlement negotiations (*id.*, ¶¶17-24); and (iii) the issuance of Notice (*id.*, ¶¶25-28).

3

Enhancements provide for, among other things:

- Establishment of a New Risk Committee (Stip., ¶V.3.2, Ex. 1 at 1-2) – Mullen will create a Board-level Risk Committee that will be tasked with overseeing the Company's risk management policies and framework. This includes monitoring Mullen's compliance with public reporting requirements and conducting internal risk assessment and internal reporting. This new committee will have at least three independent members. Attached as Exhibit 2 to the Stipulation is the Risk Committee's formal charter that Mullen will adopt and post to its website. The Risk Committee charter details the responsibilities and authority of the Risk Committee.

- Creation of a Disclosure Committee (Stip., ¶V.3.3, Ex. 1 at 2-3) - Mullen will create a management-level Disclosure Committee that will establish procedures and protocols relating to financial disclosures. The Disclosure Committee will ensure that all of Mullen's significant public statements, including Securities and Exchange Commission ("SEC") filings, material press releases, and Mullen's significant statements to non-Mullen individuals at public or private meetings, are reviewed for accuracy, integrity, and completeness, and for reviewing with management its ongoing compliance with these protocols and procedures. The Disclosure Committee members shall consist of, at least, Mullen's Chief Executive Officer, Chief Financial Officer, legal counsel, and at least one other senior officer with day-to-day oversight of the key functional areas of Mullen. Attached as Exhibit 3 to the Stipulation is the Disclosure Committee's formal charter that Mullen will adopt and post to its website.

- Audit Committee's Company Assessment (Stip., ¶V.3.4, Ex. 1 at 3) – The Audit Committee will perform a one-time internal assessment of internal controls in consultation with Mullen's outside auditors.

- Improvements to the Nominating and Corporate Governance Committee Charter (Stip., ¶V.3.5, Ex. 1 at 3) – Mullen will amend the Nominating and Corporate Governance Committee Charter which is attached as Exhibit 4 to the Stipulation. These improvements include requiring the committee to meet with each new prospective

4

Board member prior to the individual's nomination and determine whether to recommend the individual for membership to the Board. In addition to developing and recommending Corporate Governance Guidelines to the Board, the committee will ensure that these guidelines, and any amendments, are promptly made available to the public.

- <u>Improvements to the Compensation Committee Charter (Stip., ¶V.3.6; Ex. 1 at 3)</u> – Mullen will amend the Compensation Committee Charter which is attached as Exhibit 5 to the Stipulation. These modifications include the committee considering an executive officer's performance, relating to both legal compliance and compliance with Mullen's policies and procedures, when determining compensation arrangements. When determining termination benefits and/or separation pay to a departing executive officer, the committee will take into consideration the circumstances of the departure and the executive's performance, relating to both legal compliance and compliance with Mullen's policies and procedures.

- <u>Regular Executive Reports (Stip., ¶V.3.7, Ex. 1 at 4)</u> – All Mullen executives subject to the reporting requirements of Section 16 of the Securities Exchange Act of 1934 shall provide reports (either oral or written at the Board's discretion) regarding their respective areas of responsibility at all regularly scheduled quarterly Board meetings.

- <u>Improved Director Education (Stip., ¶V.3.8, Ex. 1 at 4)</u> – Currently, Mullen's Corporate Governance Guidelines provide orientation programs for new directors that are designed to familiarize them with Mullen's business and strategy. The Company will bolster this program by requiring that all existing and new outside directors attend a National Associate of Corporate Directors certified training program, or similar program, within one year of (a) entry of Final Judgment in this Action, or (b) a new director joining the Board.

- <u>Board Composition and Practices (Stip., ¶V.3.9, Ex. 1 at 4)</u> – Mullen will amend its Corporate Governance Guidelines which are attached as Exhibit 6 to the

Stipulation. The updated guidelines will limit independent directors from sitting on more than two additional public company board of directors.

- Formalization of a Whistleblower Policy (Stip., ¶V.3.10, Ex. 1 at 4-5) – Currently, Mullen's Code of Conduct states that the Company maintains "Whistle-Blower Policy and Procedures," but the policy is not publicly available and has yet been formally adopted. Accordingly, attached as Exhibit 7 to the Stipulation is the formal Whistleblower Policy that will be posted on the Company's website and provided to all current and new employees.

## III.   THE SETTLEMENT SHOULD BE FINALLY APPROVED

### A.   Legal Standards For Final Approval

Public policy strongly favors settlement as a method of resolving litigation including complex litigation such as shareholder derivative actions. *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 635 (9th Cir. 1982) (the "settlement process [is] favored in the law"). "Settlements of derivative actions are particularly favored because the cases are "notoriously difficult and unpredictable." *Lloyd v. Gupta*, 2016 WL 3951652, at *3 (N.D. Cal. July 22, 2016).

A derivative action "may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23.1(c). To evaluate a settlement, Courts in the Ninth Circuit may consider "a variety of factors as the particular facts of a case demand[,]" including the: (i) amount offered in settlement; (ii) strength of plaintiff's case; (iii) stage of the proceedings; and (iv) expense and complexity of further litigation. *In re Pinterest Derivative Litig.*, 2022 WL 484961, at *3 (N.D. Cal. Feb. 16, 2022) (citing *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998)).

When evaluating a settlement, "the court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all

6

concerned." *Officers for Justice*, 688 F.2d at 625. In shareholder derivative litigation, a settlements' fairness is evaluated to the "extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *In re Ceradyne, Inc.*, 2009 WL 10671494, at *2 (C.D. Cal. June 9, 2009) (quotation omitted). Furthermore, "[t]o determine whether a proposed settlement is within the range of possible approval," the "court also must satisfy itself that the settlement is not the product of collusion among the negotiating parties." *In re Hewlett-Packard Co. S'holder Derivative Litig.*, 2015 WL 1153864, at *3,*4 (N.D. Cal. Mar. 13, 2015) (citing *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 458 (9th Cir. 2000), *as amended* (June 19, 2000)). The Settlement meets these standards and should be finally approved.

### B.    The Settlement Provides Substantial Benefits to Mullen and its Shareholders

"The principal factor to be considered in determining the fairness of a settlement concluding a shareholders' derivative action is the extent of the benefit to be derived from the proposed settlement by the corporation, the real party in interest." *In re OSI Sys., Inc. Derivative Litig.*, 2017 WL 5642304, at *2 (C.D. Cal. May 2, 2017). Corporate governance reforms that "serve to prevent and protect [the company] from the reoccurrence of certain alleged wrongdoings" confer a substantial benefit on the corporation, which warrants settlement approval. *Unite Nat'l Ret. Fund v. Watts*, 2005 WL 2877899, at *5 (D.N.J. Oct. 28, 2005); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395-96 (1970) ("a corporation may receive a 'substantial benefit' from .... private stockholders' actions of this sort 'involv[ing] corporate therapeutics' ... [which] furnish a benefit to all shareholders"). Corporate governance reforms can provide value to a company through increased "market value" and investors who "likely will view such reforms as an additional reason to purchase the stock." *In re Apple Computer, Inc. Derivative Litig.*, 2008 WL 4820784, at *2 (N.D. Cal. Nov. 5, 2008). As such, "[c]ourts have recognized that corporate governance reforms . . . provide valuable benefits to public companies." *Moore v. Verb Tech. Co., Inc.*, 2021 WL 11732976, at *4 (C.D.

7

Cal. Mar. 1, 2021) (citing *In re NVIDIA Corp. Derivative Litig.*, 2008 WL 5382544, at *3 (N.D. Cal. Dec. 22, 2008); *In re Rambus Inc. Derivative Litig.*, 2009 WL 166689, at *3 (N.D. Cal. Jan. 20, 2009) ("The Settlement provides long term remedial measures that are specifically designed to protect the shareholders.").

Here, Plaintiffs and Mullen agree that the Settlement "confer[s] substantial benefits on Mullen and its current shareholders." Stip., §IV. Indeed, the Corporate Governance Enhancements are tailored to prevent future occurrence of the misconduct alleged in the Action.

### C. The Risks, Costs and Delay of Continued Litigation

In assessing the fairness, reasonableness, and adequacy of a settlement, the Court should balance the benefits of the Settlement against the continuing risks of litigation. *Officers for Just.*, 688 F.2d at 625. What constitutes a reasonable recovery depends on the facts of each case and recognition that any compromise involves concessions by all settling parties. Indeed, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624. Here, weighed against the substantial risk that continued litigation would yield no benefit, the Settlement's guaranteed and immediate results are fair, reasonable, and adequate. A settlement eliminates the risk and expense of time-consuming litigation. *In re MRV Commc'ns, Inc. Derivative Litig.*, 2013 WL 2897874, at *4 (C.D. Cal. June 6, 2013) (a settlement "minimize[es] delay, guarantees Plaintiffs' recovery and the implementation of substantial corporate governance reforms.").

There is no question that derivative actions are complex and fraught with risk. Indeed, the Ninth Circuit, in affirming the district court's approval of a settlement in a derivative action, noted that "the odds of winning [a] derivative lawsuit [are] extremely small" because derivative lawsuits "are rarely successful." *In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995). This case was no different.

Plaintiffs believe their claims are meritorious, but recognize the significant risk that continued litigation may not lead to any recovery for Mullen. *Basaraba v.*

1  *Greenberg,* 2014 WL 12591677, at *3 (C.D. Cal. Nov. 10, 2014) ("In the context of

2  shareholder derivative litigation, even the strongest cases have a very low likelihood

3  of success due to the myriad legal, procedural, and discovery protections afforded

4  director and officer defendants."). Thus, the uncertainties of further litigation

5  demonstrate that the proposed Settlement is within the range of approval and warrants

6  Court approval.

7      First, Plaintiffs would have to overcome Rule 23.1's heightened pleading

8  standards for demand futility. This is no easy tasks. *van der Gracht de Rommerswael*

9  *v. Auerbach*, 2019 WL 7753447, at *3 (C.D. Cal. Jan. 7, 2019) ("Derivative action

10 plaintiffs must satisfy strict pleading requirements to show that a presuit demand was

11 wrongfully refused by the board, or that making such a demand would have been

12 futile.").

13     Even if Plaintiffs demonstrated demand was futile, they would face a Rule

14 12(b)(6) motion on the merits. Thus, if Plaintiffs succeeded at the pleading stage, they

15 still faced considerable hurdles and liability was not a foregone conclusion. *In re*

16 *Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) ("Although

17 Plaintiff's case has survived two motions to dismiss … it still faces numerous

18 hurdles."). Continued litigation would be unpredictable, complex, and lengthy.

19 Document discovery would need to be completed, depositions would need to be taken,

20 experts would need to be designated, and expert discovery conducted. Moreover, it is

21 anticipated that the Settling Defendants would have fiercely defended the Action

22 through motions for summary judgment and trial. Plaintiffs would have faced the high

23 costs associated with lengthy and complex litigation, including voluminous discovery

24 and depositions.

25     Moreover, Delaware's strong business judgment presumption would afford

26 Defendants powerful defenses that would be very difficult to overcome. *In re Walt*

27 *Disney Co. Derivative Litig.*, 907 A.2d 693, 746–47 (Del. Ch. 2005), *aff'd,* 906 A.2d

28 27 (Del. 2006) and the exculpation and indemnification rights granted to directors,

absent a demonstration of intentional misconduct and disloyalty. 8 *Del. C.* §102(b)(7) (corporations may exculpate directors from personal liability for damages except where they fail to act in good faith). Indeed, for these reasons, "derivative lawsuits are difficult to win under any circumstances." *OSI Sys.*, 2017 WL 5642304, at *3.

If Plaintiffs established liability, the amount of recoverable damages would be subject to further litigation. *In re Lloyd's Am. Tr. Fund Litig.*, 2002 WL 31663577, at *21 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages ... is a complicated and uncertain process, typically involving conflicting expert opinions. The reaction of a jury to such complex expert testimony is highly unpredictable."). And it is not clear or certain what amount of damages or corporate governance reforms Plaintiffs could achieve on behalf of Mullen at trial.

Further, the issue of damages to Mullen would have been hotly disputed and clearly would be the subject of expert testimony proffered by all parties. The damages assessments of the party's experts would surely vary substantially, and the assessment of this crucial element of Plaintiffs' claims would likely be reduced at trial to a "battle of the experts." *In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745, at *11 (Del. Ch. May 3, 2004). It is far from certain that a jury would have disregarded Defendants' experts' opinions. Conceivably, a jury could find that there were no damages at all, or that damages were a fraction of the amount Plaintiffs asserted.

Moreover, a victory at trial is no guarantee that the judgment would ultimately be sustained on appeal or by the trial court. *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial). Add to these post-trial and appellate risks, the difficulty and unpredictability of a lengthy and complex trial—where witnesses could suddenly become unavailable or the fact finder could react to the evidence in unforeseen ways—the benefits of the Settlement become all the more apparent. *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 24 (2d Cir. 1987) (affirming settlement where potential defenses presented the "possibility of 'a lesser or

10

no recovery after trial'"). The Settlement eliminates these and other risks of continued litigation, including the very real risk of no recovery after years of litigation, while providing Mullen and its stockholders substantial benefits now. The immediate implementation of the Corporate Governance Enhancements is far more favorable than "the lengthy, costly, and uncertain course of further litigation." *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 163 F.R.D. 200, 210 (S.D.N.Y. 1995).

Even setting aside the significant risks inherent in proceeding, the expense and likely duration of the Action would yield diminishing returns for Mullen. The Settlement's immediate, certain, and substantial benefits of the significant improvements to the Company's corporate governance are preferable to pursuing years of uncertain litigation in the speculative hope of obtaining an even better result down the road. While the Action was still early in its procedural stages and the Settlement was reached before formal discovery commenced, Mullen produced non-public documents in the course of the Action. Stone Decl., ¶¶6, 24. The Settling Parties also exchanged additional information in connection with the mediation and settlement negotiations, and Plaintiffs undertook their own pre-suit factual investigations. *Id.*, ¶6. As such, Plaintiffs have a strong grasp of the underlying facts and alleged misconduct to support their opinion that the Settlement is fair, reasonable, and adequate. *Kabasele v. Ulta Salon, Cosms. & Fragrance, Inc.*, 2024 WL 477221, at *4 (E.D. Cal. Feb. 7, 2024) ("Given that the settlement reached was the product of arms-length bargaining following extensive informal discovery and with the help of an experienced mediator, this factor weighs in favor of final approval.").

Additionally, the Settlement frees Mullen's resources and time that would otherwise be spent on litigating the Action to strengthen the Company's internal controls and operations. *AOL*, 2006 WL 2572114, at *5 ("Termination of the litigation at this stage of the proceedings 'obviat[es] the expenditure of any future time and expense in connection with this action,' and will allow the Company to direct its full

11

1   attention to its substantive business."). Accordingly, resolution of Plaintiffs' claims is
2   particularly beneficial at this stage.

3       Weighed against the risks and expense of further litigation, the Settlement
4   should be finally approved as it provides guaranteed benefits to Mullen and its
5   stockholders.

### D.   The Settlement is the Result of Informed, Arm's Length Negotiations

8       A settlement enjoys a "strong presumption of fairness" when it is the result of
9   arm's-length negotiations between experienced and well-informed counsel. *van der*
10  *Gracht de Rommerswael*, 2019 WL 7753447, at *3; *Moore*, 2021 WL 11732976, at
11  *6 (settlement is supported by "the fact [counsel] are experienced litigators in this
12  field, have worked on this case at length, and have an understanding of its risks, also
13  cuts in favor of finding the settlement procedurally robust and the product of arm's
14  length negotiations."). Significant weight should be given to the parties' belief that
15  litigation should be settled on the agreed-upon terms, since "[p]arties represented by
16  competent counsel are better positioned than courts to produce a settlement that fairly
17  reflects each party's expected outcome in litigation." *Pac. Enters.,* 47 F.3d at 378.

18      Here, experienced counsel on both sides engaged in arm's-length negotiations
19  overseen by Mr. Meyer. The participation of a seasoned neutral reinforces a
20  settlement's fairness. *Roberti v. OSI Sys, Inc*., 2015 WL 8329916, at *3 (C.D. Cal. Dec.
21  8, 2015) ("[A]ssistance of an experienced mediator in the settlement process confirms
22  that the settlement is non-collusive."). Mr. Meyer has been a mediator for over 15 years
23  overseeing negotiations in complex actions including derivative litigation. Meyer
24  Decl., ¶4. Courts routinely recognize his involvement as mediator supports a
25  settlement's approval. *Amans v. Tesla, Inc.,* 2024 WL 1024735, at *3 (N.D. Cal. Mar.
26  8, 2024). Mr. Meyer noted that negotiations here were hard-fought as "[b]oth sides
27  possessed strong, non-frivolous arguments supporting their positions." Meyer Decl.,
28  ¶10. He also attests that the negotiations "were conducted in good faith, at arm's length,

and were not collusive. In addition, my review of the papers presented to me and discussions with counsel have led me to conclude that all counsel are skilled and experienced in this type of matter, and that all sides litigated the action in a vigorous, professional, and thorough manner." *Id*. ¶13. Counsel on both sides possessed a firm understanding of the strengths and weaknesses of the claims and defenses in the Action and are experienced shareholder derivative practitioners. Stone Decl., ¶22.

Prior to the Settlement, Plaintiffs' Counsel was well-informed about the legal and factual issues the litigation posed as they conducted an investigation into the claims and underlying issues in their investigation. Plaintiffs' Counsel's efforts included: (i) reviewing and analyzing Mullen's public statements including SEC filings, press releases, transcripts of investor calls, and news articles; (ii) reviewing and analyzing the publicly available filings against Mullen in the Securities Class Action; (iii) researching, drafting, and filing the *Witt* Action and *Morsy* Action; (iv) reviewing internal documents Mullen produced to Plaintiffs in connection with the litigation; (v) researching the applicable law with respect to the claims asserted, or that could be asserted, and the potential defenses thereto; (vi) researching corporate governance issues; (vii) preparing a settlement demand; (viii) participating in in-person and virtual mediation sessions; (ix) engaging in extensive post-mediation settlement discussions with Defense Counsel overseen by Mr. Meyer, including the exchange of corporate governance reform proposals and counteroffers; and (x) negotiating and drafting the term sheet and subsequent settlement documentation for presentment to the Court. *Id*., ¶6.

The Parties determined on an informed basis that the Settlement represents a fair, reasonable, beneficial, and practical resolution of highly uncertain litigation, and that its terms fairly account for the risks and potential rewards of the claims being settled. Significantly, Mullen's Board has determined, in a good faith exercise of its business judgment, that "the Settlement and each of its terms are fair, reasonable, and in the best interest of Mullen and its current shareholders." Stip., ¶V.2.2. Courts traditionally

13

afford substantial deference to directors' exercise of independent business judgment. *See generally Zapata Corp. v. Maldonado*, 430 A.2d 779, 782 (Del. 1981). Additionally, Mullen: (i) "acknowledges that the Corporate Governance Enhancements … confer substantial benefits on Mullen and its current shareholders" (Stip., §IV); (ii) recognizes that Plaintiffs' efforts of "the filing, pendency, and settlement of the Consolidated Derivative Action caused the adoption and implementation of the Corporate Governance Enhancements," (*Id*., ¶V.2.2), and (iii) determined "that it is desirable and beneficial that the Consolidated Derivative Action, and all of the Settling Parties' disputes related thereto, be fully and finally settled in the manner and upon the terms and conditions set forth in this Stipulation." *Id*., §III.

As the terms of the Settlement were negotiated under the guidance of an experience mediator these facts demonstrate that the settlement negotiations were conducted at arm's length, in good faith, and free of collusion. Thus, the Settlement is presumed fair, adequate, and reasonable and warrants approval. *Griffin v. Consol. Commc'ns*, 2023 WL 3853643, at *4 (E.D. Cal. June 6, 2023).

## IV.    THE NEGOTIATED FEE AND EXPENSE AMOUNT IS FAIR AND REASONABLE

### A.    The Fee and Expense Amount Was Agreed to at Arm's-Length

The Supreme Court endorses the consensual resolution of attorneys' fees issues as the ideal toward which litigants should strive. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation. Ideally, of course, litigants will settle the amount of a fee."). "[T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625; *Apple,* 2008 WL

14

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT AND FEE AND EXPENSE AMOUNT; Case No. 2:22-cv-05336-DMG-(AGRx)

4820784, at *3 ("A court should refrain from substituting its own value for a properly bargained—for agreement."). Thus, the Parties' conclusion that the agreed-upon Fee and Expense Amount is fair and reasonable is entitled to substantial deference.

Here, the Court is not asked to fashion a fee and expense award; rather, it is being asked to determine whether the Fee and Expense Amount falls within the range of reasonableness. Unlike in class actions, where the diverging interests of class counsel and absent class members at the fee stage warrant close judicial scrutiny as attorneys' fees are taken from a common fund, here, Mullen and its insurers participated in the negotiations, were represented by counsel, and had every incentive to pay the lowest possible fee for the services rendered by Plaintiffs' Counsel. *Allred v. Walker,* 2021 WL 5847405, at *6 (S.D.N.Y. Dec. 9, 2021).

Importantly, the Parties did not discuss attorneys' fees until after executing the term sheet with the Settlement's substantive terms and the Corporate Governance Enhancements. Stone Decl., ¶21; Meyer Decl., ¶11. Mr. Meyer oversaw these negotiations, ultimately issuing a proposal of $500,000 that all sides accepted. *Id*.; Stip., ¶V.6.1. Mullen agreed to the Fee and Expense Amount in recognition of Plaintiffs' Counsel's efforts in achieving a Settlement that provides substantial benefits to Mullen and its stockholders. Stip., §§V.6.1, 6.2. Although recognizing that the Court will make its own determination on this request, Mr. Meyer "recommend[s] the Settlement and Fee and Expense Award as reflective of the risks and potential rewards of the claims asserted." Meyer Decl., ¶15.

## B. The Applicable Factors Support Approval of the Agreed-to Fee and Expense Amount

The Ninth Circuit has enumerated several factors to consider when determining the reasonableness of attorneys' fees, including: (1) the results achieved; (2) the risks of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee; (5) the burdens carried by plaintiffs' counsel; and (6) attorneys' fees in similar

15

cases. *MRV*, 2013 WL 2897874, at *6. As set forth below, the Fee and Expense Amount is reasonable and appropriate in light of the Ninth Circuit's considerations.

### 1. The Agreed-to Fee and Expense Amount is Fair and Reasonable in Light of the Benefits Achieved and Attorneys' Fees in Similar Cases

The Supreme Court stated that "the most critical factor in determining the reasonableness of a fee award is the degree of success obtained." *Klein v. City of Laguna Beach,* 810 F.3d 693, 698-99 (9th Cir. 2016) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992)). "Under the 'substantial benefit' doctrine, counsel who prosecute a shareholders' derivative case which confers benefits on the corporation are entitled to an award of attorneys' fees and costs." *In re NVIDIA Corp. Derivative Litig.,* 2009 U.S. Dist. LEXIS 24973, at *12 (N.D. Cal. Mar. 18, 2009) (citing *Mills*, 396 U.S. 375). "[A] corporation may receive a 'substantial benefit' from a [stockholder's action], justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature.... [P]rivate stockholders' actions of this sort 'involve corporate therapeutics,' and furnish a benefit to all stockholders[.]" *Mills*, 396 U.S. at 397. Moreover, "the effects of the suit on the functioning of the corporation may have a substantially greater economic impact on it, both long- and short-term, than the dollar amount of any likely judgment in its favor." *Maher v. Zapata Corp.*, 714 F.2d 436, 461 (5th Cir. 1983).

Here, Plaintiffs' Counsel's efforts produced a strong Settlement that provides Mullen with valuable governance reforms, for which the agreed-to Fee and Expense Amount is fair and reasonable compensation. As discussed above, the Corporate Governance Enhancements confer a substantial benefit upon the Company and its shareholders. *See* §III(B) *supra*; Stip., §IV, Ex. 1. *In re Schering-Plough Corp. S'holders Derivative Litig.*, 2008 WL 185809, at *1, *5 (D.N.J. Jan. 14, 2008).

The cumulative value of the Corporate Governance Enhancements easily justifies the Fee and Expense Amount. In fact, this request is less than defendants have

16

paid, and courts have approved, in comparable reform-only derivative settlements: *In re Zuora, Inc. Derivative Litig.*, Case No. 3:19-cv-05701-SI (N.D. Cal. Sept. 18, 2023) ($2,000,000 fee for settlement amending disclosure committee charter to expand its responsibilities, creating chief compliance officer and chief technology officer positions, broadening audit committee obligations, and enhancing whistleblower policy, among other reforms) (Stone Decl., Exs. D, E); *van der Gracht de Rommerswael*, 2019 WL 7753447, at *4 (awarding $1,175,000 fee in settlement of reforms that primarily consisted of an independent director and the creation of a new committee which enhanced executive oversight over compliance and the alleged wrongdoing); *In re Cell Therapeutics, Inc. Derivative Litig.*, Case No. 2:10-cv-00564-MJP (W.D. Wash. May 31, 2013) ($1,300,000 fee for settlement creating a charter for the disclosure committee and expanding its duties, broadening the duties of the chief compliance officer, creating a chief governance officer position, and enhancing the whistleblower policy, among other reforms) (Stone Decl., Exs. F, G); *In re RH S'holder Derivative Litig.*, Case No. 4:18-cv-02452-YGR (N.D. Cal. Dec. 18, 2020) ($1,000,000 fee for settlement creating a charter for the disclosure committee, providing for greater audit committee oversight, setting duties for the chief compliance officer, and changes to the whistleblower policy, among other reforms) (Stone Decl., Ex. H); *Nanduri v. Small, et al.,* 1:18-cv-06524 (N.D. Ill. April 11, 2023) (approving $875,000 fee award for settlement improving communication to the Board regarding technology issues and remedial efforts, compliance including internal complaints being properly investigated, risk disclosures, and accuracy and timeliness of company's public disclosures.) (Stone Decl., Exs. I, J); *In re Synchrony Fin. Derivative Litig.*, Case No. 3:19-cv-00130-VAB (D. Conn. Apr. 5, 2024) ($885,000 fee award for settlement improving management-level disclosure committee, amending the risk and audit committee charters to expand their responsibilities, expanding the duties of the chief credit and chief risk officers,

and enhancing the company's ombuds policy, among other reforms) (Stone Decl., Exs. K, L).

Accordingly, Plaintiffs respectfully submit that the Fee and Expense Amount is fair and reasonable when compared to awards in other derivative cases.

### 2.    The Risks of Litigation

As discussed above in §III(C), Plaintiffs' Counsel faced tremendous litigation risk as derivative actions are difficult to prosecute. *Moore*, 2021 WL 11732976, at *6. To be successful, Plaintiffs would have to overcome the considerable pleading hurdles of demand futility under Rule 23.1 and a Rule 12(b)(6) motion. Then, they would face considerable discovery and face summary judgment, trial, and appeals. *Id*.

These risks, weighed against the benefits secured for Mullen and its shareholders, justify the proposed fee amount. *Cohn*, 375 F. Supp. 2d at 865-66 ("[I]t is imperative that the filing of contingent class action and derivative lawsuits not be chilled by the failure to award attorneys' fees or by the imposition of fee awards that fail to adequately compensate counsel for the risks of pursuing such litigation.… [B]ecause of the complexity and societal importance of stockholder and derivative litigation, the most able counsel should be obtained. The attorneys' fees awarded should reflect this goal.") (citing *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 310 (1985)).

### 3.    The Skill Required and the Quality of Work

The skill Plaintiffs' Counsel needed to prosecute and settle the Action and Plaintiffs' Counsel's quality of work are additional factors that support the Fee and Expense Amount. *MRV*, 2013 WL 2897874, at *6 (approving fee and finding that "the successful prosecution of this action required knowledge and expertise in the fields of shareholder derivative litigation[.]"). Plaintiffs' Counsel are nationally recognized law firms that specialize in securities and shareholder derivative litigation. Stone Decl.,

18

Exs. B, C. Here, Plaintiffs' Counsel provided high-quality representation throughout the litigation, expending significant time prosecuting the Action and negotiating the Settlement. *Id.*, ¶¶22, 41. The quality of Plaintiffs' Counsel's work and their efforts throughout the Action warrant approval of the Fee and Expense Amount. *Del Monte Foods Co. S'holder Litig.,* 2011 WL 2535256, at *13 (Del. Ch. June 27, 2011).

Additionally, "the quality of opposing counsel is important in evaluating the quality of Plaintiffs' counsels' work." *In re Heritage Bond Litig*., 2005 WL 1594403, at *20 (C.D. Cal. June 10, 2005). Mullen and the Mullen Individual Defendants are represented by King & Spalding LLP and Mr. Firer is represented by Foley and Lardner LLP. These firms, like Plaintiffs' Counsel, are experienced shareholder derivative litigation practitioners who zealously defended their clients' interest. Stone Decl., ¶22.

### 4. The Contingent Nature of the Fee and Burdens on Plaintiffs' Counsel

Plaintiffs' Counsel undertook this litigation with the expectation that they would devote many hours prosecuting the Action without any guarantee of successful resolution or of compensation for their efforts. Stone Decl., ¶37. The contingent nature of the litigation supports the Fee and Expense Amount. *MRV,* 2013 WL 2897874, at *6 (fee award supported "as [t]he litigation was undertaken by Plaintiffs' Counsel on a wholly contingent basis with the understanding that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the investment of time and money the case required."); *OSI,* 2017 WL 5642304, at *5 (approving negotiated fee and expense award in derivative case where "[c]ounsel undertook great risk in litigating this matter on a contingent basis, as there was substantial chance that no recovery would be had at the end of a lengthy suit.").

Plaintiffs' Counsel diligently investigated the claims, commenced litigation, pursued Plaintiffs' interests on behalf of Mullen with appropriate aggressiveness, and successfully brought the Action to an agreeable resolution. Stone Decl., ¶45. The

19

prosecution involved the expenditure of significant resources, including the time spent by attorneys and professional staff, as well as expenses that were incurred during the litigation, for which Plaintiffs' Counsel received no compensation during the course of litigation. *Id.*, ¶¶37, 41. Accordingly, the contingent nature of Plaintiffs' Counsel's representation fully supports the requested Fee and Expense Amount.

### 5.    A Lodestar "Cross-Check" Further Supports the Agreed-to Fee and Expense Amount

Plaintiffs' Counsel's prosecution of this Action resulted in substantial benefits for Mullen. A lodestar cross-check confirms the reasonableness of the Fee and Expense Amount. *Roberti*, 2015 WL 8329916, at *7 ("The reasonableness of [the fee amount] is confirmed by a cross-check with a lodestar comparison."). In *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043 (9th Cir. 2002), the Ninth Circuit approved the lodestar method as a "cross-check" against a percentage award and noted that "courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases." *Id.* at 1051-52. When the lodestar method is "used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized." *Young v. Polo Retail, LLC*, 2007 WL 951821, at *6 (N.D. Cal. Mar. 8, 2007).

Here, Plaintiffs' Counsel expended 655.75 hours resulting in $584,975.25 in lodestar during the successful prosecution of the Action. Plaintiffs' Counsel also incurred $26,941.98 in unreimbursed expenses in connection with litigating the Action. Stone Decl., ¶¶41-43. After subtracting these expenses, the requested Fee and Expense Amount represents a fractional lodestar multiplier of 0.81. Stone Decl., ¶44. A fractional multiplier is eminently reasonable under Ninth Circuit law. *Vizcaino*, 290 F.3d at 1051 (affirming fee amount equal to lodestar multiplier of 3.65, and listing 23 settlements and multipliers for each where the average multiplier is 3.28); *Buccallato v. AT&T Operations, Inc.*, 2011 WL 3348055, at *2 (N.D. Cal. June 30, 2011) (approving 4.3 lodestar multiplier and listing cases approving multipliers ranging from

20

4.3 to 9.3); *Destefano v. Zynga, Inc.*, 2016 WL 537946, at *21 (N.D. Cal. Feb. 11, 2016) ("Multipliers of 1 to 4 are commonly found to be appropriate in complex class action cases.").

As this is a contingent litigation, to account for the delay in payment, "(1) the court may apply the attorneys' current rates to all hours billed during the course of the litigation; or (2) the court may use the attorneys' historical rates and add a prime rate enhancement." *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 740 (9th Cir. 2016). Courts routinely apply current rates when performing a lodestar analysis or cross-check, the Court should follow suit. *Purple Mountain Tr. v. Wells Fargo & Co.*, 2023 WL 11872699, at *5 (N.D. Cal. Sept. 26, 2023) (using current rates); *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109, 1119 n.6 (C.D. Cal. 2012) ("[F]or the fee award to be reasonable, it must be based on current, rather than historic, hourly rates"). Additionally, Plaintiffs' Counsel's hourly rates are reasonable and in-line with those approved around the country. *Hope Med. Enters., Inc. v. Fagron Compounding Serv., LLC*, 2022 WL 826903, at *3 (C.D. Cal. Mar. 14, 2022) ("rates of $895 to $1,295 per hour for partners and counsel, and between $565 and $985 for associates" considered reasonable); *Fleming v. Impax Labys Inc.*, 2022 WL 2789496, at *9 (N.D. Cal. July 15, 2022) (approving hourly rates of $760-$1,325 for partners, $895-$1,150 for counsel, and $175-$520 for associates, finding these "billing rates in line with prevailing rates in this district for personnel of comparable experience, skill, and reputation").

Thus, the lodestar "cross-check" confirms that the agreed-to Fee and Expense Amount is fair and reasonable compensation for the time and labor Plaintiffs' Counsel in achieving the benefits of the Settlement.

## V.    THE SERVICE AWARDS SHOULD BE APRPOVED

Plaintiffs seek service awards of $2,000 each, or $6,000 in total, to be paid from the Fee and Expense Amount. Stip., §IV.6.1. The Service Awards is at no additional cost to Mullen or its shareholders. The Settlement would not have been achieved but

21

for Plaintiffs' participation. Acting on Mullen's behalf, Plaintiffs have enhanced the Company's corporate governance. "[Service] awards are payments to class representatives for their service . . . in bringing the lawsuit...." *Arnett v. Bank of Am., N.A.*, 2014 WL 4672458, at *11 (D. Or. Sept. 18, 2014). Service awards for plaintiffs in derivative actions are routinely awarded and "are granted to reward the public service performed by ... plaintiffs in contributing to the vitality and enforcement of securities laws." *In re Cendant Corp., Derivative Action Litig.*, 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (approving a $25,000 service award); *Sauby v. City of Fargo*, 2009 WL 2168942, at *1 (D.N.D. July 16, 2009) (upholding incentive amounts of $5,000 and $10,000 because, among other things, "[i]ncentive awards are not intended to 'compensate' plaintiffs, but instead serve to encourage people with legitimate claims to pursue the action"). Moreover, where, as here, the Service Award is to be paid from the Fee and Expense Amount, it "need not be subject to intensive scrutiny, as the interests of the corporation, the public and the defendants are not directly affected." *Cendant*, 232 F. Supp. 2d at 344.

Accordingly, Plaintiffs should be granted the Service Awards for their efforts.

## VI.    **CONCLUSION**

For all the forgoing reasons, Plaintiffs respectfully request that the Court grant final approval of the Settlement, the Fee and Expense Amount and the Service Awards.

Dated: December 6, 2024             Respectfully submitted,

**THE ROSEN LAW FIRM, P.A**.

*/s/ Erica L. Stone*
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

22

Erica L. Stone (*pro hac vice*)
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: estone@rosenlegal.com
Email: philkim@rosenlegal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston (*pro hac vice*
forthcoming)
260 Madison Avenue, 22nd Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Co-Lead Counsel for Plaintiffs*

**MAGNANIMO DEAN LAW, APC**
Lauren A. Dean, Bar No. 174722
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Telephone: (818) 305-3450
Facsimile: (818) 305-3451
Email: Lauren@MagDeanLaw.com

*Counsel for Plaintiffs Jeff Witt
and Joseph Birbiglia*

23

## <u>CERTIFICATE OF COMPLIANCE WITH LR 11-6.2</u>

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,978 words, which complies with the word limit of L.R. 11-6.1.

Date: December 6, 2024

*/s/ Erica L. Stone*
Erica L. Stone

## <u>CERTIFICATE OF SERVICE</u>

I, Erica L. Stone, hereby declare under penalty of perjury as follows:

I am an attorney at The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071. I am over the age of eighteen.

On December 6, 2024, I electronically filed the following **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT AND FEE AND EXPENSE AMOUNT** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on December 6, 2024.

*/s/ Erica L. Stone*
Erica L. Stone